RANDOLPH, CREGGER & CHALFANT LLP
THOMAS A. CREGGER, State Bar No. 124402
STEPHANIE L. QUINN, State Bar No. 216655
WENDY MOTOOKA, State Bar No. 233589
1030 G Street
Sacramento, California 95814
Telephone: (916) 443-4443
Facsimile: (916) 443-2124

Attorneys for Defendant/Counter-Defendant
UNION PACIFIC RAILROAD COMPANY

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DAVID CHAD GLOW,

                Plaintiff,

vs.

UNION PACIFIC RAILROAD COMPANY and
DOES 1 through 20, Inclusive,

                Defendants.

_____/

No. 2:08-cv-01250 LKK EFB

**DECLARATION OF THOMAS A. CREGGER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR SUMMARY ADJUDICATION**

Date: August 17, 2009
Time: 10:00 a.m.
Courtroom: 4
Judge: Hon. Lawrence K. Karlton

I, THOMAS A. CREGGER, declare as follows:

1.     I am an attorney duly licensed to practice law before the courts of the State of California, and a partner in the firm of Randolph Cregger & Chalfant LLP, attorneys of record in this action for defendant Union Pacific Railroad Company.

2.     Attached as Exhibit A is a true and correct copy of the complaint filed in this action.

3.     Attached as Exhibit B is a true and correct copy of the cited portions of the

Randolph
Cregger &
Chalfant

1  transcript of plaintiff's deposition, taken on June 17, 2009, including Exhibit 4 attached to the

2  transcript.

3      4.    Attached as Exhibit C is a true and correct copy of the cited portions of the

4  transcript of the deposition of the Dr. Jerome Schofferman, taken on August 22, 2007,

5  including Exhibit 3 attached to the transcript.

6      I declare under penalty of perjury under the laws of the United States of America the

7  foregoing is true and correct.

8      Executed on July 17, 2009, at Sacramento, California.

9

10

11                    /s/ Thomas A. Cregger

12                    THOMAS A. CREGGER

13

14

15  N:\Open\10\2036 Glow#2\USED- Consolidated Cases\MSJ\TAC Decl. iso MSJ.wpd

16

17

18

19

20

21

22

23

24

**Randolph**
**Cregger &** 25
**Chalfant**
26

2

DECL. OF THOMAS A. CREGGER ISO MSJ/MSA

# EXHIBIT
# A

1 **GANONG & WYATT, LLP**
930 Truxtun Avenue, Suite 203
2 P.O. Box 192 (93302)
Bakersfield, California 93301
3 Telephone 661.327.3337
Facsimile 661.327.3395
4
Philip W. Ganong, SBN 88414
5 Ralph Wm. Wyatt, SBN 63247

6
Attorneys for Plaintiff DAVID CHAD GLOW
7
                    UNITED STATES DISTRICT COURT
8
                    EASTERN DISTRICT OF CALIFORNIA
9
| | | |
|---|---|---|
10 DAVID CHAD GLOW,                    )    Case No. _____
                                       )
11                Plaintiff,            )
                                       )    COMPLAINT FOR DAMAGES AND
12        vs.                          )    DEMAND FOR JURY TRIAL
                                       )
13                                     )    [Personal Injury - F.E.L.A. 45 U.S.C. §51,
   UNION PACIFIC RAILROAD COMPANY)         et seq.]
14 and DOES 1 through 20, inclusive,  )
                                       )
15                                     )
                  Defendants.          )
16                                     )

17        Plaintiff David Chad Glow ("Plaintiff") complains against defendants UNION PACIFIC

18 RAILROAD COMPANY and Does 1 through 20, as follows:

19 **FIRST CLAIM FOR A VIOLATION OF THE FEDERAL EMPLOYERS' LIABILITY ACT**

20        1.    **JURISDICTION.** This action is brought under and by virtue of the provisions

21 of *inter alia* the Federal Employers' Liability Act (FELA) 45 U.S.C. § 51 *et seq.*

22        2.    **VENUE.** Venue is appropriate in this court pursuant to 45 U.S.C. § 56

23 because defendant does business in this district and the acts complained of arose at a

24 locality within this district.

25        3.    At all times herein mentioned, Defendant UNION PACIFIC was, and now is,

26 a duly organized and existing corporation doing business in other counties and states, and

27 was at all times herein mentioned, and is now, engaged in the interstate business of a

28

                                       -1-

1 common carrier by railroad. The incidents complained of arose while Plaintiff was

2 performing his duties in the furtherance of, or effecting, interstate commerce.

3     4.     At all times mentioned herein, Defendants UNION PACIFIC and DOES 1

4 through 20, and each of them, were carriers as defined by 49 U.S.C. § 20302 *et. seq.*, the

5 Safety Appliance Act, Federal Rail Safety Act and 49 U.S.C. § 20701     *et. seq.*,the

6 Locomotive Inspection Act, and other federal railroad and California Public Utility

7 Commission safety acts, regulations, and orders and were controlled by and subject to the

8 provisions of said acts, regulations and orders. Plaintiff is ignorant of the true names and

9 capacities of Defendants sued fictitiously as Does 1 through 20. Plaintiff is informed and

10 believes and thereon alleges that Defendants were the employees, agents, co-venturers of

11 each other and in some capacity caused or contributed to the injuries and damages averred

12 to herein. Plaintiff will seek leave to amend this complaint to allege the true names and

13 capacities when ascertained.

14     5.     On or about September 14, 2007 Plaintiff was employed by Defendant as a

15 locomotive engineer. During the course of Plaintiff's shift he was required to work on a

16 locomotive running between Portola, California and Elko, Nevada. The speedometer on the

17 engineer's instrument panel was not functioning and the engineer's seat back was loose,

18 unstable and arm rests were unsafe for the Plaintiff. The malfunctioning speedometer

19 caused Plaintiff to be required to constantly rotate his head and neck to look over his

20 shoulder at the speedometer on the back panel in order to monitor his train speed during

21 a full shift. This was coupled with an engineer's seat that was not adequate to protect

22 Plaintiff from the injury causing potential of the usual shocks, jolts and vibrations customarily

23 experienced on moving locomotive engines.

24     6.     Defendant was negligent in its inspection, reporting, care and maintenance

25 of the locomotive in failing to provide a reasonably safe work environment for the Plaintiff

26 and reasonably safe equipment with which to perform his job duties. As a result of the

27 negligence and other conduct of Defendant UNION PACIFIC, and Does 1 through 20, and

28

-2-

1  each of them, Plaintiff was caused to sustain serious and permanent injuries to his neck,
2  and to sustain great pain and suffering all to Plaintiff's general damage. As a further direct
3  and legal cause resulting from the above-described wrongful conduct of Defendant, Plaintiff
4  suffered humiliation, embarrassment and severe mental anguish and anxiety and suffering
5  in the loss of enjoyment of the ordinary pleasures of every day life, including the right to
6  pursue gainful employment of his choice, all to his damages according to proof as will be
7  established at trial, in an amount in excess of the minimum jurisdictional limits of the above
8  entitled Court.

9      7.     By reason of the conduct described in this claim, and as a further result
10 thereof, Plaintiff was forced to and did incur an indebtedness for the services of duly
11 licensed physicians and surgeons, for x-rays, medicine, appliances, hospitalization, and
12 other care in a sum as yet unascertainable, and Plaintiff is informed and believes, and
13 thereupon alleges that he will require further medical attention as a result of said injuries
14 and therefore incur further indebtedness according to proof at trial.

15     8.     As a further direct result of the above-described negligence and carelessness
16 of Defendant UNION PACIFIC, Plaintiff has been disabled from working at Plaintiff's usual
17 occupation and has, and will, in the future suffer lost wages, earnings, earning capacity,
18 economic losses, and other financial damages according to proof.

19     9.     As a further legal result of the above-described carelessness, and negligence,
20 Plaintiff will in the future be required to incur an indebtedness for vocational rehabilitation
21 costs and the services of others to do work around the house and for the benefit of Plaintiff,
22 all to his damages in an amount as yet not certain and final but according to proof at trial.

23     **SECOND CLAIM FOR VIOLATION OF THE LOCOMOTIVE INSPECTION ACT**

24     As and for a separate and distinct Second Claim, Plaintiff complains against the
25 UNION PACIFIC and alleges as follows:

26     10.    Plaintiff incorporates and re-alleges as if set forth in full paragraphs 1 through
27 5 of his Complaint.

28

-3-

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL [Personal Injury - F.E.L.A. 45 U.S.C. §51, et seq.]

1      11.    This Second Claim is brought pursuant to Federal Employers' Liability Act

2  ("FELA"), 45 U.S.C. § 51 et seq, the Locomotive Inspection Act ("LIA"), 49 U.S.C. §§

3  20701, et seq., and applicable provisions of those rules and regulations promulgated by the

4  Federal Railroad Administration ("FRA") as set forth in 49 C.F.R. Chapter 200, et seq.

5      12.    At all times material, during Plaintiff's employment, the locomotive engine on

6  which Plaintiff was required to work was dangerous and defective within the meaning of the

7  LIA (49 U.S.C. §§ 20701, et seq.) and the regulations promulgated by the FRA, in that,

8  among other things, the locomotive engineer's panel speedometer and engine seat which

9  Plaintiff was required to use was, under the circumstances, inadequate, unsafe and

10  defective for their intended function; and, because the speedometer was malfunctioning

11  Plaintiff was required to constantly rotate his head and neck to observe and monitor the

12  speedometer located on the rear panel and the locomotive engine seat on which Plaintiff

13  worked and rode, unreasonably endangered Plaintiff in that the seat was not adequate to

14  protect Plaintiff from the injury causing potential of the usual shocks, jolts and vibrations

15  customarily experienced on moving locomotive engines which Plaintiff was required to use

16  during the course of his work assignment on that date.  As a direct result of the above-

17  described inadequate, defective and unsafe conditions, Plaintiff was exposed to unsafe and

18  dangerous levels of shocks, jolts and vibrations which caused unsafe levels of stress and

19  strain upon the tissues and structures of his neck  so that Plaintiff was caused  to suffer the

20  injuries and damages described in this claim.

21      13.    As a direct result of the above-described statutory violations, Plaintiff was

22  injured and received the following personal injuries, to wit: serious and permanent injuries

23  to Plaintiff's body including but not limited to his neck, all to Plaintiff's general damages. As

24  a further direct and legal cause resulting from the above-described wrongful conduct of

25  Defendant, Plaintiff suffered humiliation, embarrassment and severe mental anguish and

26  anxiety and suffering in the loss of enjoyment of the ordinary pleasures of every day life,

27  including the right to pursue gainful employment of his choice, all to his damages according

28

-4-

1  to proof as will be established at trial.

2       14.    As a further direct result of the above-described statutory violations, Plaintiff

3  was forced to and did incur an indebtedness for the services of duly licenses physicians and

4  surgeons, for x-rays, medicine, appliances, hospitalization and other care in a sum as yet

5  unascertainable, and Plaintiff is informed and believes and thereupon alleges that he will

6  require further medical attention and will therefore incur a further indebtedness, according

7  to proof at trial.

8       15.    As a further direct result of the above-described statutory violations, Plaintiff

9  has been injured and disabled and will in the future suffer lost wages, earnings, earning

10 capacity, economic losses, and other financial damages according to proof.

11      16.    As a further legal result of the above-described statutory violations, Plaintiff

12 will in the future be required to incur an indebtedness for vocational rehabilitation costs and

13 the services of others to do work around the house and for the benefit of Plaintiff, all to his

14 damages in an amount as yet not certain and final but according to proof at trial.

15 **THIRD CLAIM FOR A VIOLATION OF DISABILITY DISCRIMINATION
16 AND FAILURE TO ACCOMMODATE UNDER THE CALIFORNIA
FAIR EMPLOYMENT AND HOUSING ACT**

17      As and for a separate and distinct Third Claim, Plaintiff complains against the UNION

18 PACIFIC and alleges as follows:

19      17.    Plaintiff hereby incorporates and realleges as if set forth in full paragraph 1

20 through 5.

21      18.    **SUPPLEMENTAL JURISDICTION**. This claim is brought under 28 U.S.C. §

22 1367(a) in that it is transactionally related to the first claim brought under FELA, 45 U.S.C.

23 § 51 and the second claim brought under the Locomotive Inspection Act, 49 U.S.C., §

24 20701.

25      19.    Plaintiff complied with all conditions precedent to jurisdiction under the

26 California Fair Employment and Housing Act ("FEHA"), California Government Code

27 sections 12900, et seq., by timely filing a complaint with the California Department of Fair

28

-5-

1   Employment and Housing ("DFEH") regarding the illegal conduct made the subject matter

2   of this claim. Thereafter, and in a timely fashion after receipt of his right-to-sue letter from

3   the DFEH, Plaintiff has filed this complaint. (Attached hereto as Exhibit 1 and by this

4   reference made a part hereof is a true and correct copy of Plaintiff's "Right to Sue" letter.)

5       20.    At all times herein mentioned, Defendant UNION PACIFIC was, and now is,

6   a duly organized and existing corporation doing business in other counties and states, and

7   was at all times herein mentioned, and is now, engaged in the business of a common carrier

8   by railroad and interstate in the State of California and is an "employer" within the meaning

9   of California Government Code Section 12926(d).

10      21.    At all times material, Plaintiff is and has been an employee of Defendant

11  working as a Engineer.

12      22.    Plaintiff, at all times relevant, is physically disabled within the meaning of

13  California Government Code section 12926(k).

14      23.    On or about July 30, 2007, Plaintiff informed Ray Perry, Defendant's General

15  Superintendent, of his work restrictions and requested reasonable accommodation for work.

16  On or about August 6, 2007, Plaintiff's counsel also informed Defendant's counsel of

17  Plaintiff's work restrictions and requested reasonable accommodation for work.

18      24.    On September 14, 2007, Plaintiff was caused to suffer a new physical injury

19  to his neck, as a result of Defendant's failure to reasonably accommodate his disability. He

20  sought and continues to obtain treatment from licensed physicians who placed work

21  restrictions on Plaintiff, including restricting him from working as a locomotive engineer. As

22  a result of his physical disability, Plaintiff is limited in his major life activities, including the

23  ability to work without reasonable accommodation.

24      25.    Despite the request for reasonable accommodation made by Plaintiff and by

25  Plaintiff's counsel, Defendant did not respond to the request(s) until Defendant sent a letter

26  to Plaintiff's counsel dated October 23, 2007, advising that Plaintiff's request for reasonable

27  accommodation was "unrealistic" and offering to purchase Plaintiff a seat insert.

28

-6-

1    26.    As a direct and legal cause resulting from Defendant's above-described and
2    wrongful conduct against Plaintiff, Plaintiff was caused to suffer harm, including lost wages,
3    earnings, earning capacity, economic losses, loss of employment benefits and other
4    financial damages according to proof.

5    27.    As a further direct result of the above-described statutory violations, Plaintiff
6    was forced to and did incur an indebtedness for the services of duly licenses physicians and
7    surgeons, for x-rays, medicine, appliances, hospitalization and other care in a sum as yet
8    unascertainable, and Plaintiff is informed and believes and thereupon alleges that he will
9    require further medical attention and will therefore incur a further indebtedness, according
10   to proof at trial.

11    28.    As a further direct and legal cause resulting from the above-described
12   wrongful conduct of Defendant, Plaintiff suffered humiliation, embarrassment and severe
13   mental anguish and anxiety and suffering in the loss of enjoyment of the ordinary pleasures
14   of every day life, including the right to pursue gainful employment of his choice, all to his
15   damages according to proof as will be established at trial.

16    29.    As a further legal result of the above-described statutory violations, Plaintiff
17   will in the future be required to incur an indebtedness for vocational rehabilitation costs and
18   the services of others to do work around the house and for the benefit of Plaintiff, all to his
19   damages in an amount as yet not certain and final but according to proof at trial.

20    30.    The above-described discriminatory actions of Defendant was done with
21   malice, fraud and/or oppression and in reckless and/or conscious disregard of Plaintiff's
22   legal rights under FEHA, entitling Plaintiff to punitive damages.

23    WHEREFORE, as to all claims, Plaintiff prays for those damages as follows:
24    (a)    General damages in excess of this Court's jurisdictional limits;
25    (b)    All medical, surgical, health care and incidental expenses according to proof;
26    (c)    All loss of earnings, earning capacity, economic losses, and other financial
27           damages according to proof;

28

-7-

1      (d)     All costs of suit; and

2      5.     Such other and further relief as the Court deems just and proper.

3   Dated: June 4, 2008.                  **GANONG & WYATT, LLP**

4

5                                         By:/S/ Philip W. Ganong
                                             Philip W. Ganong/Ralph Wm. Wyatt
6                                            Attorneys for Plaintiff

7

8

9                       **DEMAND FOR JURY TRIAL**

10      Plaintiff David Chad Glow hereby demands a jury trial of the claims set forth in

11   this Complaint.

12   Dated: June 4, 2008.                  **GANONG & WYATT, LLP**

13

14                                        By: /S/ Philip W. Ganong
                                             Philip W. Ganong/Ralph Wm. Wyatt
15                                           Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28
                                  -8-

# EXHIBIT
# B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

--oOo--

DAVID CHAD GLOW,

                    Plaintiff,

    vs.                              CASE: 2:08 CV-01250
                                           LKK EFB

UNION PACIFIC RAILROAD COMPANY,
and DOES 1-20,

                    Defendants.
_____/

CERTIFIED
COPY

                    Deposition of

                DAVID CHAD GLOW

            Wednesday, June 17, 2009

                    --oOo--

Reported By:     Stacey M. Gates, CSR #9255



METRO REPORTING

1451 River Park Drive
Suite 275
Sacramento, CA 95815
(916) 482-0444
Fax (916) 482-5712

Deposition of David Grow

```
1    Q.        Now, do you remember the date that you
2    were released for light duty?
3    A.        I'd have to refer to medical documents.
4    Q.        Okay.
5    A.        I don't have the exact date in my mind
6    right now.
7    Q.        Okay.  Could it have been in April of
8    2007?
9    A.        That sounds right.
10   Q.        Okay.  And after your release for light
11   duty, did you then start working some time after
12   that -- did you then start working full capacity?
13   A.        Yes.
14   Q.        And when did you start working full
15   capacity?
16   A.        Let's see.  Roughly a month after I was
17   released for light duty I was able to return to
18   full duty.
19   Q.        Okay.  Are there any documents that you
20   could look at that would let you know for sure when
21   that return was?
22   A.        Yes.
23   Q.        What would those be?
24   A.        Time book.
25   Q.        Okay.  I'm going to represent to you that
```

11

1   Dr. Schofferman's records indicate that you were
2   released to work without restrictions on June, I
3   believe, 8th of 2007.  Does that seem correct to
4   you?
5   A.      That sounds right.
6   Q.      Okay.  And did you then return to work as
7   a locomotive engineer after June 7th, 2008?
8   A.      Yes.
9   Q.      I'm sorry, 2007?
10  A.      Yes.
11  Q.      Do you recall what your -- what date you
12  returned to work?
13  A.      No.
14  Q.      You don't, okay.
15          But it was in June 2007, do you think?
16  A.      Sounds right, yes.
17  Q.      How would you describe the condition of
18  your neck when you returned to work as a locomotive
19  engineer?
20  A.      Condition of my neck?
21  Q.      Yeah.  I mean were you in pain?  Did you
22  have any pain?  Did you have any pain or was it
23  normal?  Like how would you describe it?
24  A.      I would describe it as -- as being better
25  than -- than it was previous to my surgery.

1    ambiguous, lacks foundation, calls for speculation.
2             Go ahead.
3             THE DEPONENT:  Probably.
4    Q.        BY MS. MOTOOKA:  Okay.  And this is -- you
5    can remember it?  You remember feeling motor
6    weakness in your arm or hand, your right arm or
7    hand, prior to your surgery?
8    A.        Yes.
9    Q.        Okay.  When you --
10            MR. GANONG:  Before you ask the next
11   question I would like to take a quick break if I
12   may.
13            MS. MOTOOKA:  Sure.
14            (Recess taken.)
15   Q.        BY MS. MOTOOKA:  So on September 14th,
16   2007, you were working on the KLTG14 locomotive?
17   A.        Be a KLTG1.  That's a train symbol.
18   Q.        Okay.
19   A.        KTL isn't a complete train.
20   Q.        But you were working on the 14th of
21   September?
22   A.        Yes.
23   Q.        Okay.  And was this a -- which run were
24   you doing?
25   A.        Portola to Elko.

```
1   don't remember details, but do you remember
2   anything is what I'm asking.
3   A.          No.
4   Q.          But you do remember that you discussed it?
5   A.          Of course.
6   Q.          Do you recall if the speedometer was, in
7   fact, malfunctioning on that trip?
8   A.          I do recall that it was malfunctioning,
9   yes.
10  Q.          When did you first notice that the
11  speedometer was malfunctioning?
12  A.          Got the train up to speed is when it
13  started acting up.  It was roughly around 50 miles
14  an hour from what I remember.
15  Q.          So you noticed it when the train hit 50
16  miles an hour?
17  A.          Around 50 miles an hour roughly.
18  Q.          Okay.  And just to be clear, between zero
19  and roughly 50 you didn't notice any problem with
20  it.  It's when the speedometer hit around 50 that
21  you noticed a malfunction?
22  A.          Yeah.
23  Q.          What was the malfunction if you can
24  describe it?
25  A.          The malfunction of the speedometer?
```

```
 1   Q.        Uh-huh.
 2   A.        It wasn't working.  It was inaccurate.
 3   Q.        And you could tell that because?
 4   A.        Because the needle would bounce from 50 to
 5   70 to 30 to 50 to 70 to 60.  It wasn't working.
 6   Q.        Okay.  So you hit a certain speed and the
 7   speedometer would start to bounce?
 8   A.        Yeah.
 9   Q.        Okay.  Do you remember roughly how long
10   into your trip it was that the train -- that you
11   noticed the speedometer malfunctioned?
12   A.        No.
13   Q.        You can't estimate?  Was it an hour, two
14   hours, three hours?
15   A.        It would be speculation.
16   Q.        Okay.  Do you remember if it was light
17   outside or dark outside when you noticed?
18   A.        It was still a little light outside.
19   Q.        And just for background, do you remember
20   how long it took you to take the train from Portola
21   to Elko, that trip roughly?
22   A.        Roughly ten hours.
23   Q.        And you started around maybe 5:00 or 6:00
24   p.m.?
25   A.        Sounds good to me, yeah.
```

```
 1    Q.         Is there anything else that an engineer
 2    should do besides report it if there is a bad
 3    speedometer?
 4    A.         Yeah, there is things that you should
 5    do.
 6    Q.         Can you describe them?
 7    A.         Can I describe them?  At the end of your
 8    trip you can -- you document the defect on the FRA
 9    screen or your engineer's tie-up screen.  That's
10    reporting.
11    Q.         Okay.
12    A.         Which I did.
13    Q.         Okay.
14    A.         You can verify that the speedometer is bad
15    by checking the mile markers and verifying, you
16    know, that the speed is bad or whatever.  What I
17    did is I used the speedometer that was working in
18    the locomotive, so I had an operable speedometer.
19    It was just in the wrong location.
20    Q.         Okay.
21               MR. GANONG:  Wendy, before you ask another
22    question, I would like to take another break which
23    will hopefully be a little shorter.
24               MS. MOTOOKA:  Okay.
25               (Recess taken.)
```

27

1   Q.          BY MS. MOTOOKA:   So were you able to
2   monitor the train's speed on September 14th, 2007?
3   A.          Yes.
4   Q.          And how did you monitor the train's speed?
5   A.          By referring to the panel.  The rear panel
6   on the locomotive has a computer screen.
7   Q.          Okay.
8   A.          And the computer screen -- to my knowledge
9   the way I understand this, correct me if I'm wrong
10  or whatever, but it's linked to a satellite, so
11  it's GPS.  It's supposed to be right on basically,
12  so that's what I used to verify my speed is the
13  rear panel behind me in the computer.
14  Q.          I'm not terribly familiar with
15  locomotives, so can you explain to me what the
16  inside of the locomotive cab looks like?  Like I
17  mean how many people are there?  Are two people
18  operating it?
19  A.          There is two people on board.  There is
20  one person operating it and that would be the
21  engineer.
22  Q.          I assume there is a seat for the engineer
23  and a seat for the conductor?
24  A.          And there is a seat for the brakeman and
25  there is a seat for a flag or a road foreman let's

28

1    asking if the conductor seat is to the left of the

2    engineer's control stand or if it's in the back?

3    Q.        Well, it seems -- I think you said that

4    normally, and actually let's just say for this

5    particular train that you were on, the engineer's

6    seat was on the right side?

7    A.        Yes.

8    Q.        And the conductor was on the left?

9    A.        Yes.

10   Q.        So were they parallel to each other or is

11   one slightly more forward?

12   A.        Parallel.  Side by side.  Parallel just

13   across the cab.

14   Q.        Okay.  And so which speedometer was

15   malfunctioning?

16   A.        The engineer's speedometer which is on

17   this one, I believe, was above my head.  They put

18   them in two different spots.  Generally they'll be

19   above the head or in the middle, and the

20   conductor's speedometer I know looking back was

21   above his head and was not working either.  So both

22   of the speedometers, the engineer's and

23   conductor's, wasn't working or malfunctioning.

24   Q.        Okay.  So then there was another

25   speedometer in the rear console?

30

1    A.        <u>Yes.</u>

2    Q.        So how many total speedometers are there

3    in a locomotive, this locomotive, that you were in?

4    A.        There -- there was three.

5    Q.        Okay.  Now, where is the rear console in

6    relation to the engineer seat?

7    A.        The rear console in relation to the

8    engineer seat is directly --

9            MR. GANONG:  Hang on a second.  I'm going

10   to object to the question as it relates to the term

11   "rear console" as being vague and ambiguous,

12   assumes facts not in evidence.  There is a lack of

13   foundation that a rear console exists as opposed to

14   a panel.

15           Go ahead, I'm sorry.

16   Q.        BY MS. MOTOOKA:  I'm sorry, did I

17   misspeak?  Is it a rear panel?  Would you prefer if

18   I called it a rear panel?

19   A.        Yes, that's what it is.

20   Q.        Okay.  I'm sorry, I wasn't trying to

21   change it into something that it wasn't.

22   A.        No, I believe I had said console.  Yeah,

23   it's a rear panel with a computer screen.

24   Q.        Okay.  So where is the rear panel in

25   relation to the engineer's seat?

31

1    A.        Directly behind the engineer and directly

2    behind the conductor.  It's a big wide panel that's

3    about as wide as the locomotive cab basically.

4    It's a big wide panel behind our seats.

5    Q.        Okay.  And I think you said you were able

6    to monitor the speed of the train by looking at the

7    console behind you.  I'm sorry, the panel behind

8    you.  The speedometer on the panel behind you.

9    A.        Looking at the computer screen which has a

10   speedometer function behind the engineer's seat on

11   the rear control panel, yes.

12   Q.        Okay.  And are you able -- you're able to

13   see this from where you're sitting to operate the

14   train?

15            MR. GANONG:  The question is vague and

16   ambiguous as to the term "you're able to see it."

17   Do you mean if he's sitting looking straight ahead

18   can he see it?

19   Q.        BY MS. MOTOOKA:  I mean do you have to get

20   up out of your chair to see the panel?

21   A.        No.

22   Q.        So you can see the panel from your --

23   A.        I have to turn around --

24   Q.        Okay.

25   A.        -- in order to see the panel.  You can't

32

1   swiveling my chair what I could and turning behind
2   me to verify the speed of the train.
3   Q.       Who was the conductor with you on that
4   trip?
5   A.       Dale Fox.
6   Q.       Did Dale Fox help you to monitor the
7   speed?
8   A.       Yes.
9   Q.       How did he do that?
10  A.       While he was in his conductor's seat he
11  would turn and look behind him and he would tell me
12  the speed and then I would verify it by turning and
13  looking at the panel, you know.  So it was
14  constantly throughout the whole trip we were
15  monitoring the speeds together.
16  Q.       Can you give an estimate as to how many
17  times you turned around to look at that rear panel?
18  A.       No.
19  Q.       Can you estimate how often you turned
20  around to look at the rear panel?
21  A.       Once again this estimation would be
22  speculation, but every 30 seconds in a ten-hour
23  trip.  I guess you could add that up and we could
24  come within a speculation or an estimated time.
25  Q.       So you think it could be as frequent as

35

1    every 30 seconds?

2    A.        Yes.

3    Q.        Did you talk about the condition of your

4    neck with Mr. Fox on this trip?

5    A.        I believe there was some talk about the

6    condition of my neck, yes.

7    Q.        Do you remember what the substance of that

8    discussion was?

9    A.        I told Mr. Fox that turning -- that

10   turning around and looking at this rear control

11   panel was really, you know, bothering my neck.  It

12   was hurting me.

13   Q.        Okay.

14   A.        And it was making me miserable.

15   Q.        Okay.  Do you remember if he said anything

16   in response?

17   A.        I don't recall him saying anything in

18   response to me complaining about my neck hurting,

19   no.

20   Q.        So your neck was hurting while you were on

21   this trip?

22   A.        Yes.

23   Q.        Could you describe what the nature of that

24   pain was?

25   A.        The nature of the pain was -- well, from

36

1  what I remember is being in extremely excruciating
2  pain, like say ten stars out of ten stars.
3  Q.        Okay.
4  A.        And I wanted very badly to stop the
5  locomotive out in the middle of the desert and get
6  an ambulance to take me off but --
7  Q.        Okay.
8  A.        -- I couldn't do that because I was in
9  fear of losing my job.
10 Q.        Okay.  So do you remember roughly when it
11 was in the trip that you began to feel that way?
12 A.        Roughly it seemed like it was just past
13 Winnemucca.
14 Q.        Do you know how to calculate a
15 locomotive's speed using your watch and the mile
16 markers?
17 A.        Yes.
18 Q.        Had you been trained to do that by Union
19 Pacific?
20 A.        There is a --
21            MR. GANONG:  Hang on.  Sorry.
22            THE DEPONENT:  There is a rule in the rule
23 book that tells you.
24            MR. GANONG:  Excuse me, the question was
25 had you been trained to do that.  Not whether there

37

1    was a rule book or writing.

2             THE DEPONENT:  No.

3             MR. GANONG:  Unless that was used to train

4    you.  Had you been trained to do that?

5             THE DEPONENT:  No, I've never been trained

6    to do that.

7    Q.        BY MS. MOTOOKA:  But you knew how to do

8    it?

9    A.        Yes.

10   Q.        How did you learn that?

11   A.        How did I learn that?  I learned that by

12   reading the rule book system special instructions.

13   Q.        Did the railroad ask you to read the rule

14   book?

15   A.        Did they ask me to read the rule book?  I

16   guess the question would be yes -- I mean the

17   answer because it's part of the rules to read the

18   rule book.

19   Q.        You're required to know the rules as an

20   engineer?

21   A.        Yes.

22   Q.        Do they test you on the rules?

23   A.        Yes.

24   Q.        Did you calculate the speed of the

25   locomotive using your watch on the September 14th,

1    2007, trip to Elko?

2    A.        Not that I recall, no.

3    Q.        Why not?

4    A.        There was no calculating.  The speedometer

5    was bad.  It was malfunctioning.  It didn't work,

6    so there was really no calculating it.  It was no

7    good.

8    Q.        But can't you tell the speed of the train

9    based on the time and the mile markers along the

10   track?

11   A.        Yeah, that's a method that you could use

12   to verify your speed.

13   Q.        So when it -- I'm wondering -- what I'm

14   asking is I think you were saying it was very

15   painful for you to look at the rear panel behind

16   you to see the speed of the train?

17   A.        Yeah.

18   Q.        So what I'm asking is as an alternative

19   why didn't you calculate the speed of the train

20   using your watch and the mile markers instead of

21   looking behind you?

22   A.        To me it would be -- it would be a little

23   bit hard.  I've never ran a train using a stopwatch

24   before.  I've got a lot of things going on up in

25   that cab, you know, up in the locomotive cab.  I

                                                        39

1   have speed restrictions that I have to monitor.  I

2   have signals that I have to pay attention to.  I

3   have a conductor that's telling me stuff.  So, you

4   know, I didn't think of it I guess at the time.  I

5   had a speedometer at the rear that was working that

6   I was using.

7   Q.        Okay.

8   A.        So I used the tools that were provided to

9   get the job done or to get the train over the road

10  safely.  That's how I chose to do it.

11  Q.        You did have a watch though, right?

12  A.        Yes.

13  Q.        Okay.  Other than the faulty speedometer,

14  did you notice any other problems with the train on

15  that trip to Elko on September 14th/15th, 2007?

16  A.        I don't inspect the train, so to my

17  knowledge the train itself was fine.

18  Q.        Okay.  So you didn't notice any problems

19  with the seat, the engineer's seat?

20       MR. GANONG:  That's a locomotive.  Wendy,

21  these guys differentiate between the train which

22  could be the power units or the power concess and

23  the car concess.

24       MS. MOTOOKA:  Okay.  Let me rephrase.

25       MR. GANONG:  Okay.

40

 1   question under Rifkin.

 2              Go ahead.  Next question, please.

 3   Q.         BY MS. MOTOOKA:  On June 7th, 2007, did

 4   Dr. Schofferman release you to work without

 5   restrictions?

 6   A.         Without referring back to my documents, I

 7   couldn't tell you that it was exactly the 7th, but

 8   it was somewhere around there.

 9   Q.         Okay.  So some time in June of 2007

10   Dr. Schofferman released you to work without

11   restrictions?

12   A.         Yes.

13   Q.         So when you were working September 14th

14   and 15th of 2007, you were working without

15   restrictions?

16              MR. GANONG:  Are you asking him without

17   restrictions or without a request for

18   accommodation?

19              MS. MOTOOKA:  Without restrictions.

20              THE DEPONENT:  Without restrictions?  I'd

21   have to refer back.  I wasn't working with any

22   restrictions, no.  No.  I wasn't cleared for full

23   duty to return to the railroad at a full capacity.

24   Q.         BY MS. MOTOOKA:  Were you disabled on that

25   day when you started work?

1   the 14th of September, 2007?

2              MR. GANONG:  Excuse me.  Hang on a second.

3   Lack of foundation, it calls for speculation, it

4   calls for an improper opinion as that term is used

5   as a term of legal art.

6              Go ahead.

7              THE DEPONENT:  Can you ask it again?

8              MR. GANONG:  How about we just have it

9   read back and that way I don't have to object

10  again.

11             (Reporter read back as requested.)

12             THE DEPONENT:  Yes.

13  Q.         BY MS. MOTOOKA:  Okay.  What accommodation

14  did you request?

15  A.         I turned in a prescription from my doctor

16  requesting a more ergonomical locomotive seat and I

17  believe that it read and/or headrest.  Let's see,

18  how did this work?  I turned in a request to get me

19  some type of a headrest or ergonomical chair and

20  the second request that I turned in was for a

21  modified work schedule.

22  Q.         Do you remember when you turned in the

23  request for the ergonomic seat?

24  A.         I don't have the date off the top of my

25  head, but I do have documentation that I had sent

123

1    A.        Yes.

2    Q.        And was there another request involving a

3    modified work schedule?

4    A.        Yes.

5    Q.        Okay.  When did you put in the request for

6    the modified work schedule?

7    A.        Some time after the request for the

8    ergonomic seat with a headrest.

9    Q.        And to whom did you make that request?

10   A.        That would be to Ray Perry.

11   Q.        Okay.  Did you get a response to that

12   request?

13   A.        I believe the response was once again

14   after I was injured in the 2007 injury.

15   Q.        That you recall getting one?

16   A.        I don't personally recall, no.

17   Q.        Okay.

18                            (Defendant's Exhibit

19                            Number 4 was marked.)

20   Q.        BY MS. MOTOOKA:  Exhibit 4 is a -- well,

21   maybe you can tell me what it is.

22             Do you recognize this document?

23   A.        Yes.

24   Q.        What is that?

25   A.        That is a prescription from SpineCare

126

1    Medical Group from Jerome Schofferman requesting on
2    July 25, 2007, an ergonomic locomotive operator
3    chair, head/neck rest/restraint, good armrest, air
4    or hydraulic ride.
5    Q.        Okay.  And is this the prescription that
6    you referenced earlier in the deposition that you
7    turned in to Ray Perry?
8    A.        Yes.  Yes, it is.
9    Q.        Okay.  Do you have something specific in
10   mind that the railroad could have provided you
11   with?  I mean were you thinking of something
12   specific that would accommodate you?
13   A.        Yes.
14   Q.        What did you have in mind?
15   A.        A headrest.
16   Q.        Okay.  So if they provided you with a
17   headrest, that would have been -- that would have
18   been sufficient for you?
19   A.        At the point in time when I requested --
20   when I turned in these accommodations?
21   Q.        Uh-huh.
22   A.        Yeah.  I would say that a headrest would
23   have -- would have helped me out tremendously.
24   Q.        Do you know what an air ride is?
25   A.        I know what they do, and I know they're on

127

1    at the time of the incident in September 2007?

2         MR. GANONG:  Excuse me, vague.  The

3    question is vague and ambiguous.  Do you mean craft

4    or --

5    Q.       BY MS. MOTOOKA:  Was it a pool job?

6    A.       Yes.

7    Q.       And what runs did you do in this pool job?

8    A.       Let's back up.  I don't recall if I was on

9    the pool or I was on the extra board when this run

10   took place.

11   Q.       All right.  In whichever job it was, the

12   pool job or the extra board, do you always operate

13   the same locomotive?

14   A.       No.

15   Q.       So you would operate whichever locomotive

16   needed to be operated when you were called to work?

17   A.       Yeah, locomotive assigned to a certain

18   train ID that I got called for.  Yes.

19   Q.       Do you believe that if you had been

20   sitting in a different type of chair on September

21   14th and 15th of 2007 that you would not have the

22   injuries that you claim today?

23        MR. GANONG:  Excuse me.  The question is

24   an incomplete hypothetical, lacks foundation, calls

25   for speculation, calls for improper opinion.

                                                    132

18:44

**SPINECARE**
**MEDICAL GROUP**

☑ Jerome A. Schofferman, MD
☐ Paul J. Slosar, MD
☐ Raymond Hsieh, MD
☐ Edward C. Sum, MD

☐ Noel D. Goldthwaite, MD
☐ James B. Reynolds, MD
☐ Garrett D. Kine, MD

1650 Sullivan
Suite 200
Daly City, CA 940

(650) 985-7540    (650) 985-7510

Name: _Guiby David_

Date: _7/25/07_ 20

Address: _____

℞ Reasonable accommodation

Ergonomic keyboard & greater chair

Heel/foot rest [restraint]

Good arm rests

Air or lymbar relo

Label as such

Refill _____

SC-0002 (Rev. 02/05)

EXHIBIT 4
Deposed
behelor Cert.
www.DEPOBOOK.com

STATE OF CALIFORNIA )
                             ) ss

COUNTY OF SACRAMENTO      )

### REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition,

DAVID CHAD GLOW,

was by me duly sworn to testify to the truth, the whole truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of June, 2009.

CERTIFIED COPY

_____

STACEY M. GATES, CSR #9255
State of California

# EXHIBIT
# C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


DAVID CHAD GLOW,

        Plaintiff,

vs.                        No.   C 05 01933 MMC

UNION PACIFIC RAILROAD
COMPANY, HOWARD REDMOND,
an individual, and DOES
 through 20, inclusive,

        Defendants.

AND RELATED CROSS-ACTIONS.




DEPOSITION OF JEROME SCHOFFERMAN, M.D.



Date:       Wednesday, August 22, 2007

Time:       2:46 p.m.

Location:   SPINECARE MEDICAL GROUP
           1850 Sullivan Avenue, Suite 200
           Daly City, CA 94015

Reporter:   REGINA A. LAWSON, RPR, CSR No. 11619

Job No:    57234

```
 1              I haven't seen.

 2         A.   I'll just give it to you like --

 3         Q.   Yeah.  And if I could -- I'll take five minutes

 4    or so.  And then if we need to wrap up any more, we

 5    will.  Otherwise, we'll terminate the deposition.

 6    That's all right?

 7         A.   Yes.

 8              MR. WYATT:  I think we'll conclude the

 9    deposition.  It has a different meaning.

10              MR. CREGGER:  You're right.

11              (Discussion off the record.)

12              MR. CREGGER:  Exhibit 3 is a note from

13    Dr. Schofferman's chart dated June 7th, 2007.  That's

14    the Established Patient Evaluation which he had referred

15    to earlier.

16              MR. WYATT:  Okay.  Thank you.

17              MR. CREGGER:  Here's that one.

18              And Exhibit 4 is a note from Dr. Schofferman's

19    file Established Patient Evaluation dated April 13th,

20    2007.

21              MR. WYATT:  Okay.

22              MR. CREGGER:  There's Exhibit 4.

23              MR. WYATT:  Thanks.  I just didn't want to have

24    a gap.

25              MR. CREGGER:  That's fine.
```

**SpineCare Medical Group, Inc.**
1850 Sullivan Avenue, Suite 260
Daly City, California 94015
(650) 985-7500


EXHIBIT
8/22/07
3
SCHOFFERMAN, MD

Patient Name:   **DAVID GLOW**
Patient #:      **184165**
Date of Service: **June 7, 2007**

## ESTABLISHED PATIENT EVALUATION

The patient returns for a follow up doing well. He underwent C4-5 ACDF on 12/06/06, therefore he is now six months after surgery.

### SUBJECTIVE COMPLAINTS:

**Chief Complaint:** Neck pain. He rates it as 2/10. There is no arm pain.

**Current Condition:** His level of function is good. He can perform all activities of daily living. However, he has not yet returned to work, modified or full duty. I did release him to return to work on 04/13/07 but, to date, this has not occurred.

**CURRENT MEDICATIONS:** Norco 10/325 mg 2-4 q.d. He takes this toward the middle and end of the day.

### OBJECTIVE FINDINGS:

**Physical Examination:** He stands with normal posture. There is 25-30% loss of flexion and 50% loss of extension. Left and right axial rotations are normal. Upper extremity motor exam and sensory exam are normal.

**Review of Imaging Studies:** CT scan, cervical spine, 05/22/07: The fusion appears solid. Adjacent segments look fine. There may be some mild changes at C7-T1.

**DIAGNOSIS/IMPRESSION:** Excellent response to anterior cervical discectomy and fusion at six months.

### DISCUSSION/PLAN:

1. The patient is released to work full duty as a locomotive engineer as of 06/08/07. There are no restrictions. 

2. Medications renewed. He will not use them while actually working, but will take medications p.r.n. after he has completed his shifts. However, there is no evidence of any impairment or adverse effects with respect to alertness, coordination, reaction responses, or personal or general safety. The use of hydrocodone by Mr. Glow at he current doses is consistent with safe performance to the best of my ability to make this judgment.

Page 1 of 2

1   STATE OF CALIFORNIA           )

2   CITY AND COUNTY OF SANTA CLARA   )

3

4

5           I, REGINA A. LAWSON, RPR, CSR No. 11619, do

6   hereby certify:

7           That prior to being examined, the witness named

8   in the foregoing deposition was by me duly sworn to

9   testify to the truth, the whole truth and nothing but the

10  truth;

11          That said deposition was taken down by me in

12  shorthand at the time and place therein named, and

13  thereafter reduced to typewriting under my direction.

14          I further certify that I am not interested in

15  the outcome of this action.

16          Witness my hand this _____28_____ day of

17  August, 2007.

18

19

20

21

22

23                  _Regina A. Lawson_____

24                  REGINA A. LAWSON, RPR
                    CSR No. 11619
25                  State of California